Good afternoon. Sorry we are late. We had a long morning and we all needed to get up and walk around a little. But we'll get you out of here in reasonable time, we hope. All right. So, Ms. Kuhn, if you want to proceed. Oh no, sorry, Ms. Stanek. It's the yellow one, not the pink one. Amara Stanek Thank you, Your Honor. Good morning, Your Honor. Good afternoon, Your Honor. My name is Amara Stanek with the Office of the State Appellate Defender. And may it please the Court, Counsel. I represent here my client, Appellant Oscar Martinez. In this case, in Oscar's case, it begins and ends with intent. The only difference between the two charges of attempted murder and aggregated discharge of a weapon is intent. That was the only element at issue in this case. There's no question this was Oscar. There's no question he shot this gun. The only question to the jury was why. Within seconds of the shooting and arrest, Oscar said in various iterations, I'm sorry, I'm sorry, I panicked. I didn't know what the fuck I was doing. That was evidence of his state of mind. That was an excited utterance. The jury had a right to hear those words, to weigh those words. What was the amount of time between the statement and the firing of the gun? The first shot that was fired, it was 60 seconds prior to the actual statements that were made. 60 seconds between when the first shot and the statements after he was pulled up off the ground from surrendering. And there is some theory that I'm sorry, I'm sorry could relate to many things. How do we relate it to the shooting at the officers as, well, let's just start there. How do we relate it to the shooting toward the officers? Absolutely, Your Honor. Any discrepancy or any conjecture as to what that meant, if there's any question about that, it should have gone to the jury. Second, the State in their closing said there's only one option. There's only one option. They said what other, he said that I'm sorry, what other conclusion is there? What possible alternative is there? We're not saying that this was the only conclusion that they could have come to. The fact that he said I'm sorry, I panicked, I didn't know what I was doing. That's not the only reason. But it should have been up to the jury to decide. And it allowed the State to argue in closing that, in fact, the only reason that's presented to the jury was that he meant to kill. And didn't the judge also find that this statement, aside from the fact that it wasn't state of mind or later accepted veterans, didn't he also say it wasn't relevant? Yes, Your Honor. Why did he, I mean, what's your theory on that? Judge, Your Honor, we're saying that this is absolutely relevant. It's relevant to intent. The fact that he said he panicked, the fact that he said he didn't know what he was doing, that directly goes contrary to a counterstatement, which was that he meant to kill or that he meant to do this. It's an exact sort of counter to that argument. And it would have allowed the defense to rebut the State's theory that this was the only option. They were allowed to present to the jury that there was no other option because the judge didn't allow the other option in. The judge took that away from the jury. But you were trying to get in the statements he made in the jail, too, in lockup? Yes, Your Honor. How were those excited utterances? Your Honor, in the brief, the defense attorney below argued that they were excited utterances as well as state of mind. We focused on the fact that they were state of mind rather than excited utterance due to the fact that they were 20 minutes after the whole incident at the scene. However, the statements that he made at the jail were essentially a repeat, just a support of the statements that he had said before, that he didn't know what he was doing. He added a number of statements that explained a little bit that he was suffering from a lot of mental illness and was suicidal at the time. But he repeated the same thing that he had said at the scene, which was that he panicked. He didn't know what he was doing. The one thing that he added is, I think, and I'm going to paraphrase, I shouldn't be living now or something like that. Was he, I mean, was he looking for the officers to kill him? You know, Your Honor, the record is unclear about that. You know, the statements that he made, that he panicked, that he didn't know what he was doing, kind of speaks to some of the chaos. And, you know, just the fact that it was not clear what his intent was. It was not clear that he intended to kill anyone. But didn't the trial court look at, in conjunction with the statements, to determine or to maybe, I should say, dismiss your state of mind issue, is that he shot directly at the officers. The officers testified. He was looking right at them and shot like six shots, I think Mondo said, and right after them, looking right at them. And also, one other question, was it objected to at trial? I'm sorry, Your Honor, was what objected to at trial? Did you raise the issue of excited utterance and object to this testimony at trial of his intent? Yes, Your Honor. It was raised at motion in limine, and I believe it was raised again at trial when one of the officers began to testify about what Oscar had said as he was being arrested. And the judge cut off that officer and said, no word. We dealt with this in the motion in limine. We're not going there. And so that was the place that the defense attorney objected and felt that that should have gotten in at that point when the officer began to talk about what was being said. With regard to the statements of the officers, they testified to a number of things, and you're correct that that was essentially what Officer Mondo testified to. But another officer testified that, you know, he could see that everyone probably had a different view of where the shots were going, that it was chaos, that they were ducking in under different cars. And a careful viewing of the body cams, I think, also tends to explain a little bit that it was, even the officer's statements, you know, varied in terms of where he was. One of the officers, you know, admitted on a cross, you know, yes, he could have been here. I thought he was here. Maybe he was shooting from here. You know, the undercurrent of the officer's testimony was essentially that this was chaos, you know, and they did testify that bullets were coming, you know, towards them or they heard one behind them, et cetera. But it still was critical in viewing that evidence and understanding that evidence and the context of that, what was the intent, regardless of where the bullets ended up. This was critical evidence, circumstantial evidence. The only way the jury could have known what was going on in his mind and what was happening here was through his statements. Not only that, it supports Oscar's demeanor after the incident. He was pretty calm as he came out of those woods. I mean, he, and I think the trial judge mentioned that. He wasn't, he didn't seem to be excited. He didn't seem to be startled. He was just sort of deadpanning almost. And so I think he took that into account. But so how does that demeanor reflect excited utterance, that he was startled or whatever the case may be? Yeah. Your Honor, there's no requirement that excited utterance be loud or forceful. The judge took that interpretation. Certainly another interpretation could have been that he was in shock and that he was remorseful. In the car, the officers testified, you know, essentially that he was, continued to be remorseful. He was cooperative. He was not antagonistic toward the police. He was not saying anything, you know, that one might expect him to be saying if he just intended to kill officers. He wasn't mad. He wasn't angry. He wasn't confrontational. You know, he was subdued. He did not say, you know, that's the police or something that you would have expected from someone who had the intent, who went in there wanting to kill an officer. Instead, he was panicked. He didn't know what he was doing. I think those were his immediate words before he had any chance. All of this is after the event, right? All these statements are after the event. Expression of remorse is not the same, I don't think, is the same as saying that I never meant to hurt anyone. I'm sorry for what I did. I'm now in handcuffs and in a lot of trouble. That's not the same thing as saying I never meant to hit anybody or I never meant to kill anyone. Or an alternative explanation, I just was firing into the air. I mean, there's a significant difference here. Yes, Your Honor, and that is what the state argued. The state argued there's no other alternative. The I'm sorry meant I'm sorry I meant to do that. The question is, does it arise, is it sufficient for state of mind? Absolutely, Your Honor. There's no requirement that state of mind happen simultaneously with, for example, the shots being fired. If that were true, it would swallow up the excited utterance question. State of mind is often proved by things that are said before or after. Particularly, there are cases that talk about, you know, confessions that were coerced, et cetera, false confessions after the fact are still admissible in terms of a state of mind of a defendant or of a witness. And so expecting that this would be potentially shouted out at the exact time that all these bullets are flying everywhere, you know, doesn't mean, you know, the state of mind is the state of mind at the time the statements were uttered. The statements were uttered immediately after the fact. And so that circumstantial evidence, the fact that they were uttered so quickly and the fact that, you know, again, the requirement is that it's his state of mind at the time that he's speaking those words. And what is he trying to say? What is he saying about his state of mind when he fires the gun that we can extrapolate out of the words, I'm sorry? He said, I panicked. He said, I panicked. I didn't know what I was doing. And that's about as opposite to I intended or knew what I was doing. I knew I was wanting to, for example, kill police. I panicked. I didn't know what I was doing. Let us talk about the statement that did come in. I'm sorry, Officer, I know you probably have a family. And this is what you in your brief argue is a complete misdoctrine. Yes. At that point that that came in, was there an objection? Did anybody raise the complete misdoctrine at the time or at any post-trial motions? Not in the post-trial motion, Your Honor. The defense attorney raised essentially only a reasonable doubt in the post-trial motion. However, that was raised through an objection, I believe, in the motion in limine initially. The objection was under the complete misdoctrine. And the judge understood that not to just be under the common law complete misdoctrine, but the judge addressed it under Rule 106. And that was really the critical difference and what we're arguing needs to be considered. Because leaving that out, leaving out the statements that he panicked and didn't know what he was doing, allowed the state to argue to the jury that there's only one. There's only one option. There's no possible alternative. There's no possible other conclusion when there was. His actual words were the other alternative. And the jury had a right to hear that. The jury should have heard that. The jury should have been able to take that into account and have the entire picture when making a decision as to why this happened, what the intent was behind all of this, or the lack thereof. He wasn't holding his mother hostage during this event, was he? Not as far as the evidence came out at trial. The mother was following behind him. And what about, was it a sister also following, or was it the girlfriend that had just jilted him? You know, the testimony from the officers was the mother and another person, essentially, and it wasn't clear who that person was. I know that there was one officer who testified that the mother was following him and essentially trying to talk him down off of what was going on. And were there, I was a bit unclear, were there shots fired inside any building or were all the shots that were apparent fired outside? There was one shot that was fired into the ceiling inside. But we know that that's kind of a dangerous issue, too. We don't know who's upstairs. But none of the attempt murder charges stemmed from inside. They all stemmed from outside. Correct. Correct. I believe so. And the statement that did come in came through a body cam, right? Yes. One of the body cams was redacted. Maybe that was the one at the booking area? Yes, there were two that were redacted. If I can refer to my notes, the defendant's supplemental exhibit two was the body cam that took place at the scene. The judge cut that off as soon as he was on the ground and arrested. What the defense tried to get in was that supplemental exhibit two, where it continued on right from there with Oscar's words after that. And the same with the jail. That was defendant's supplemental exhibit one that was excerpted from what had happened at the jail. Well, excited utterance is often looked at in terms of time and has the person going to be claiming it's an excited utterance had time to think about what the circumstances were in a way to maybe work his or her way out of the circumstances. And probably the one that's most telling or might have been the most helpful was I know you people probably have a family. And that one was when he got put in the cell, correct? As he was being walked to the cell. Right. Now, how can that be an excited utterance at that time when 20, 30 minutes have already gone by? That's a good point, Your Honor. That was actually brought in by the state. The judge allowed that in by the state as a statement against interest. And part of the way that they were able to use that then was to tell the jury that the only thing that sorry meant was in that context with that phrase afterwards that he meant to kill them. I'm sorry, you have a family. You would have died. I tried to kill you. That's what they're essentially arguing to the jury. That's it. They're saying that's it. There's nothing else. And he wasn't one of the officers at the scene, was he? I don't believe he was. I would have to check the record to be certain about that. I don't believe he was. Essentially, you know, part of the completeness doctrine, Oscar was apologizing to every police officer he could possibly find at this point. He even asked as far as can you please bring in some of the officers so I can apologize. I need help. You know, I panicked. I'm so sorry. I didn't know what I was doing. You know, the statements that he made at the jail were not the first time that he had 20 minutes to think about it. It was essentially a reiteration of the things that he said immediately upon, you know, his arrest at that point. And his attorney did not have any sort of a medical, psychological or medical witness at the time of trial, correct?  Okay. Justice Jurgensen? Mr. Shostak? Yes. You'll have an opportunity to respond. Thank you, Your Honors. Now, Ms. Kubler. Good morning or good afternoon, Your Honors. My name is Katrina Kuhn. I represent the people of the State of Illinois. May it please the Court and Counsel. The people's two main points are defendant has forfeited these arguments, and number two, the trial court made correct evidentiary rulings within its full discretion. How is that correct ruling to allow that statement to come in, I know you have families, and not let anything else come in? How, and as she indicated, the appellate defender indicated that they wanted to show that, can I remember what she said, the State wanted to show that, I don't even remember what she said they wanted to show, but in any event. No other explanation. Yeah, there is no other explanation, but in any event, I mean, how is it fair to allow that portion in and then not allow everything else? Well, first of all, I don't believe that the defendant is arguing on appeal that there was anything wrong with allowing that statement in. But they argued about the completeness doctrine, didn't they? They argued that the statements in the jail should have been allowed to explain or clarify the statement, I'm sorry, I know you have a family. I believe that's what. Yeah, that's not completeness, Doctor. That's why, you know, he said a lot of stuff after that, didn't he? I believe defendant's argument is the statements, and I call them the holding cell statements in my brief, so you might find them referred to as that. The statements in the holding cell, which were, I need help, I'm so sorry, I didn't know what I was doing, I'm not going to be okay. Those were needed to come in under Rule 106 in the completeness doctrine to clarify, I call it the booking statement, which is, I'm sorry, officer, I know you probably have a family. Right. That statement was made to officer, it was on Officer Caskey's body camera, and I believe it was made to Officer Groves, who was one of the officers who was shot at. He was at the scene, but one of the other ones, I think, the one who walked into holding was not at the scene. Correct. But he apologized to Officer Groves, who was at the scene and was shot at. Now, this is a specific intent crime, correct? It is. It is. How could these statements not be relevant? I don't think the trial judge really explained. He just used, he said they're not relevant. It's just not relevant. What did he mean? Well, Judge Shaines meant that to be relevant, a statement has to either prove or disprove, have it move somewhere on the needle of showing the defendants, you know, what the defendant meant. Well, it's a specific intent crime. Yes. So his state of mind is important, isn't it? I'm sorry could mean I'm sorry I just shot at you even though I meant to do it. It could mean I'm sorry I didn't mean to shoot. It could mean many, many things. Wasn't that for the jury to determine? Well, it's for the judge to determine correctly relevant evidence. Well, it's for the judge to determine, as they did in this case, whether or not it's admissible. And under what hearsay exception, it is admissible. Correct. But relevance, you can't get to relevance unless you deem that it is admissible. Correct. But the judge found that it did not reflect his intent. It found that it could have been interpreted to mean many different things. Basically, these were defendants' own statements, which are generally not competent evidence and they're generally excluded. And the reason that they're generally inadmissible is because their relevance depends on the truth of the matter asserted or its falsity, and the defendant is the person who would be able to say that. That's why the value of the statement would rest in the credibility of the speaker. And the reason that intent, yes, this is a specific intent crime. Intent can be formed instantaneously, and this defendant formed that intent. The intent can be shown by the use of a deadly weapon and firing at officers. The defendant knew that these officers were present. The evidence of this, and when we look at this in terms of plain error, which is defendant's burden, is substantive, if not overwhelming. The defendant, and again, we have to be under first-pronged plain error here, if anything, because defendant also argues second-pronged plain error, and the cases that defendant cites are cases where the defendant testified and the trial court prevented the defendant from testifying as to certain matters. And here, defendant did not testify, defendant did not present any evidence, and defendant was not deprived of his right to a defense by these rulings. Wasn't he deprived of his right of a defense if the court ruled against him and they're submitting improperly? I mean, what would he get up on the stand and say if the court precluded him from testifying to certain things? The court didn't preclude defendant from testifying to anything. The court precluded the speaker from presenting certain evidence. He didn't preclude him from testifying about certain things, but he said to him, you're not going to be testifying as to your specific intent, correct? I don't. Based upon his ruling. He didn't say that based upon his ruling? Your Honor, I don't. I'm not saying he literally said it. I'm saying based upon his ruling. The effect of the rulings was not to allow this evidence of his. Correct. Not to allow his own statements made, not made at the exact time of the shooting, and I'll get into contemporaneousness if you like, but that did not prevent defendant from presenting other evidence, including taking the stand, and that is not. What other evidence? I've tried to think as I was reading briefs and looking at the record. What other evidence could he have presented? Could he have said, I shot at, it was dark. I shot at voices. I was despondent. Would the judge have let despondent in? Isn't that just a variation of I'm sorry? Or, you know, and he wouldn't let him testify as to mental health issues. So what could he have testified to? Again, Your Honor, the court didn't say defendant couldn't testify as to his mental health issues. The court said that he was not allowed to present this evidence, these statements on the body cam video, because they went to his mental health, and actually that's, I think, why defendant wanted them to come in, but the court never said you will be prevented from testifying to ABC theories of evidence if you testify. That's what happened in Quick and Kristen, that second pronged plain error. Defendant were under the prong of first pronged plain error, and this is defendant's burden to show that the judge's rulings were clear and obvious error. And respectfully, Your Honor, it's not simply that you might have disagreed or that no reasonable person could agree with these rulings. Okay. The bottom line is defendant was trying to get these statements in through the testimony of the police officers. Well, through the body camera. Okay, through the body camera. Through the recordings of his statements on the body camera. Okay. And how do they come in if those statements are hearsay? Well, how do they come in as recorded in the body camera? So just if it's on the body cam, it's admissible? Well, what Judge Shaines did is he made a ruling, he was shown the entire body camera, and he said that the whole, I call them the booking statement was admissible, the I'm sorry I know you have a family is admissible, and actually people never, I don't think they, the defendant never tried to exclude that, but he excluded the statements at the scene and the holding cell statements for those specific reasons that were argued by the people and the defendant fully argued against. So I don't know if I understand your question, Your Honor. But, again, we're in the arena of plain error. Defendant does not have to testify, but defendant does have the burden to show first-prong plain error, which is based on the evidence, and that evidence must be closely balanced. And that does not include the evidence that he's saying was excluded. The defendant needs to point some evidence, which counterbalances the evidence showing his guilt, and that in that arena, these statements should have come in, so it doesn't really look at the statements themselves. This defendant fired three shots, fired, emptied his weapon at these officers. He fired three sets of two shots each. He shot at them after they shouted for him to put his weapon down. He was looking directly at them. They were hiding behind an SUV. At least two of them were hiding behind the SUV, and there were bullet holes in the SUV. So how does he see looking right at them? It's in a parking lot. It's 1 o'clock in the morning. Was there any evidence about the lighting conditions in the parking lot presented at the trial? Well, just from my recollection of the body camera, I could see fairly well. I could see. Well, maybe they could see his eyes, but could he see their eyes? He's looking into the dark. He's on a sidewalk walking out of the building, and I'm assuming there's a light at the door or there's something that could have been seen. Well, the defendant, as I recall, he was kind of on the edge of the parking lot. He had the wooded area behind him, but I had no problem seeing him. The defendant, so your question is whether the defendant could have actually saw the officers. Two of the officers specifically said, he was looking right at me. How did he know he was looking right at him? He's looking into the dark. They're looking into the light. Well, they were behind an SUV. They told the defendant to drop the gun. I presume you could hear where the voice is coming from. There's no question he knew that they were police. And Officer Groves testified that the defendant weighed the gun and pointed it at his mother while they talked. He did not shoot it at his mother. But then he shot it at Officer Mondo and Officer Groves just after they shouted for him to put his weapon down. So that's clearly. But they weren't all standing in a row. No, they were not in a row. They were in different places, certainly. And they weren't behind their own cars, which I thought was kind of interesting. I didn't think they were behind cars. No, they parked a little bit away, and then they had to walk and go to where he was. And just a couple of things about, first of all, the excited utterance. Justice Hutchinson asked about that. There are four criteria, and I say them in page 33 of my brief. And one of those criteria is the passage of time. There are two other criteria that are relevant here, very important here, which are the nature of the event and the utterance. The other one is whether the statement is self-interested. And so this, as I also say in my brief, mostly statements that are excited utterances come from people who are victims of shootings and not shooters. That kind of reflects these criteria. Usually it's someone who isn't aware that there's going to be a shooting going on, and they have a reaction to that. The other two considerations are passage of time and declarance condition, but you also have to look at the nature of the event and the utterance when you're considering excited utterances. And as far as state of mind for both of these sets of statements, the statements at the scene and the statements in the holding cell, they must relate to the defendant's intentions, plans, and motivations at the time of the utterance. This did not, you know, at the time of the utterance. Not a minute later, not two minutes later. These statements, you know, I'm sorry, I panicked, I don't know what I'm doing, did not reflect the defendant's intentions or plans or motivations at the time he shot at police. Well, he didn't say it while he was shooting, but he threw out his gun in response to one request, walked out, and hit the ground. They didn't have to put him on the ground. He hit the ground. And that had to be 20, 30 seconds. How can that not be related to this incident? It's temporarily related, but it doesn't mean that he didn't have the intent to shoot the officers, and that's really what is key here. At the time he was shooting. At the time he was shooting. And it is a very fine line. People recognize that. But, again, intent can be formed instantaneously. It can, remorse can happen instantaneously. I panicked doesn't mean that I didn't intend to shoot. It could mean that I intended to shoot them, and I now realize that that was a large mistake. How many records have you reviewed that the shooter says, hey, you guys, I know you're on cops, I'm going to shoot at you now, and I'm going to kill you? Have you ever found one record that says that? That may have happened in some case. That did not happen here. Again, each judge made these rulings based on the circumstances in front of him. But, again, yes, the defendant will say, I'm going to shoot at you, I'm planning to shoot at you, I will shoot at you for a reason. And the defendant does rely on a case called Bartall. Bartall is distinguishable because in Bartall the defendant said what he was about to do and then he had a specific thing he was going to shoot at. He said, I'm going to shoot at the tires. And he's made that statement before. Yes, he did, and then he did it. And, again, I realize that it's not always, there's kind of a sliding scale there in terms of the contemporaneousness. Your Honor, if I can just go to one quick point about the Rule 106. This issue was forfeited. The defendant did not argue this to the trial court. Counsel never adopted the trial court's sua sponte ruling. Even if this court does consider that on the merits, just the fact that statements pertain to the same subject matter does not meet the requirement for Rule 106. Judge Jayne said that the holding cell statements or the jail statements of, you know, I'm sorry, I'm sorry, were not part of the same conversation of the occurrence as the booking statement. And they weren't needed to explain the statement because in both statements, he's saying that he's sorry that these later statements were not needed to explain the holding cell statement. Are there, may I answer any other questions? Your Honor. Justice Shostak? Yes. For those reasons, we ask that the judgment of the trial court be affirmed. Thank you. Thank you. Ms. Stanek, if you wish to respond, you may. Thank you, Your Honors. I'll do this as briefly as I can. The first issue I'd like to raise or deal with really quickly is the issue of forfeiture. We argued, one, that there's a constitutional exception to forfeiture and that that should apply in this case. If not, then second-pronged plain error absolutely is fitting as is first. But with regard to the second-pronged plain error, not allowing the defense to present evidence of the single issue that's at issue is of constitutional dimension. And courts have found in situations where this type of constitutional issue could be raised again in a post-conviction petition and could be reviewed at that point, courts have found that forfeiture does not have to apply in that case and have addressed the issue on direct appeal. That's in People v. O'Carro citing People v. Craig and finding that where a defendant raised the constitutional issue at trial and could later raise it in a post-conviction petition, the constitutional issue exception applied as to the forfeiture. And so that was one position that we took on the forfeiture. The other thing I'd like to address really briefly is the State's argument throughout their brief that all that needed to happen in this case was for Oscar to take the stand and testify. And Oscar had a constitutional right to due process, and he also had a constitutional right not to testify and to remain silent. And it should not be his duty to give up one in order to obtain the other. Further, a defendant has the right to seek appellate review of an evidentiary ruling. And, in fact, it's been held that by testifying, you don't get to do that anymore. And so that also would have been given up. And finally, I think as the State was describing this and looking at the judge's ruling on this, Oscar testifying would not have cured the judge's underlying finding that this was not relevant. It may have dealt with a hearsay issue, but direct testimony has to be just as relevant as body-cam footage and alleged... if he had made certain statements that the trial judge would have found it to be irrelevant and sustained an objection that we don't know would have been made or not. Absolutely. Isn't that somewhat speculative? It is absolutely, Your Honor, just as speculative as the State's suggestion that if he had been allowed on the stand, the judge would have allowed that to come in. And that's a risk, obviously, to... There was already a motion eliminated with respect to that, correct? Correct. I mean, I guess that difference could have made an offer of proof, but... And so another thing that the State argued, again, in closing, they argued that I'm sorry could have meant only one thing. Now, in a peer-reviewed state, it's potentially, it could mean any number of things. And again, that goes directly to our argument that they should have been allowed to present the alternative. The jury should have heard this. The jury needed to have a comprehensive view of everything that had happened. Relevance is the absolute lowest possible bar to admitting something at trial. It nearly has to have the tendency to show something that's at issue. It does not have to conclusively prove. You know, again, it's the most minimum thing that anyone has to basically find. And for the judge to leave these statements out on the basis of relevance, any reasonable trier of fact would not have done that. And that's the issue when looking at everything that happened in the trial and all of the objections that were made in terms of the hearsay exceptions. Again, Oscar, just like any defendant who comes before the court, had the right to a fair trial. He had the right to present his defense. And he had the right to a jury who had heard everything that could have come in and should have come in. This was not a fully informed jury that could have made a fully informed decision. When you look at these videos and see where they're cut off, when you look at the things that were denied and not allowed to come in, the difference between these two charges, it severely prejudiced Oscar. The jury should have been able to consider essentially the aggravated discharge case. And at the end, the prejudice to Oscar was substantial because the difference between the two charges is a minimum of 10 years and a minimum of 40 years. And Oscar was 21. He'll never be eligible for parole after 20 years. And for all intents and purposes, this was an absolutely critical thing that the jury should have been allowed to decide. If you don't have any more questions. Thank you. Thank you, Your Honor. Thank you very much. All right, thank you for your arguments today. I do appreciate them. And we are now going to stand adjourned.